UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                             **MEMORANDUM & ORDER**
                                  06-249 (NGG)

     v.

EDWARD BEDROS,

               Defendant.
-----------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

**I.    Background**

On April 13, 2006, Defendant Edward Bedros ("Bedros" or "Defendant") was indicted on one count of unlawful entry into the United States after a conviction for the commission of an aggravated felony, in violation of 8 U.S.C. § 1326. (Docket Entry # 6.) Thereafter, upon Defendant's motion (Docket Entry # 11), the court ordered psychological evaluations of Defendant to assess his competency to proceed, (see Docket Entries # 15, 21).

Defendant was evaluated by Dr. Jason Hershberger, M.D. ("Dr. Hershberger"), an expert retained by defense counsel (see July 24, 2006 letter to the court from Anthony K. Modafferi and attached Psychiatric Assessment ("Hershberger Report") (Docket Entry # 17)), and by Dr. Elissa R. Miller, Psy. D. ("Dr. Miller"), a forensic psychologist appointed by the court, (see October 30, 2006 letter to the court from Marvin D. Morrison, Warden, Metropolitan Correctional Center and attached Competency To Stand Trial Evaluation and Criminal Responsibility Evaluation ("Miller Report")). Dr. Hershberger diagnosed Bedros with Schizophrenia, Disorganized Type, noting that Bedros denied the existence of a mental condition, that he was not malingering, and that the

1

condition had been untreated for over twenty years.  (Hershberger Report at 6-7.)  As a result, Dr. Hershberger concluded that Bedros was unable to understand the nature and consequences of the proceedings and to assist properly in his defense.  (Id. at 7-8.)  Similarly, Dr. Miller diagnosed Bedros with Schizophrenia, Disorganized Type and concluded that he was not currently competent to stand trial.  (Miller Report at 10-11, 14.)

As a result of these conclusions, on August 29, 2007, the court ordered Defendant hospitalized for treatment "to determine whether there is a substantial probability that in the foreseeable future [] the defendant will attain the capacity to permit criminal proceedings to go forward against him."  (Docket Entry # 43.)  In accordance with the August 29 Order, Dr. Mark Cheltenham, M.D., a Staff Psychiatrist in the Mental Health Department at the Federal Medical Center in Butner, North Carolina, and Dr. Carlton Bryant, Ph.D., a Staff Psychologist at the same facility, performed a competency restoration evaluation on Bedros, which included a review of the aforementioned evaluations performed by Dr. Miller and Dr. Hershberger.  (See February 25, 2008 letter from Warden A.F. Beeler to the court and attached Forensic Evaluation ("Evaluation") marked as Government Exhibit 1 and admitted into evidence at a hearing on June 2, 2008.)

## II.     Dr. Cheltenham's Testimony

At a June 2, 2008 hearing, at which Defendant was present with counsel, Dr. Cheltenham testified under oath via video link as to the conclusions contained in the Evaluation.[1] (June 2, 2008 Transcript of Hearing ("Tr.") at 4.)  Dr. Cheltenham testified that he had performed a

---

[1] After the Government inquired as to Dr. Cheltenham's qualifications and experience, the court, with no objection from defense counsel, found him qualified as an expert in forensic psychiatry.  (Tr. at 8-9.)

competency restoration study on Bedros, which included seven formal evaluations over the course of four months. (Tr. at 9-10.) Consistent with the previous diagnoses, Dr. Cheltenham diagnosed Bedros with Schizoprenia, Disorganized Type and concluded that he was not competent to proceed to trial. (Id. at 11-12.) Further, Dr. Cheltenham testified that Bedros did not have "any insight" into his mental illness, denied suffering from a mental illness, and refused to take oral antipsychotic medication voluntarily on the numerous occasions when it was offered to him. (Id. at 12-14.)

As a result, Dr. Cheltenham recommended involuntary medication pursuant to 18 U.S.C. § 4241(d) in order to restore Bedros to competency to proceed to trial. (Id. at 13; Evaluation at 8.) More specifically, Dr. Cheltenham testified that Bedros met the criteria set forth in Sell v. United States, 539 U.S. 166, 177-183 (2003) for determining whether involuntary medication is warranted in order to restore a defendant's competency to stand trial.[2] Under Sell, a district court must find that (1) important governmental interests are at stake;[3] (2) involuntary medication will significantly further those interests, i.e. that administration of the drugs is substantially likely to

---

[2] The Sell Court indicated that a district court should first consider whether involuntary medication may be warranted based on a defendant's dangerousness or grave health needs before considering whether such measures may be necessary in order to restore a defendant to trial competence. Sell, 539 U.S. at 181-82. In the Evaluation, Dr. Cheltenham concluded that Bedros does not pose a threat to himself or others, nor does he pose a threat to the secure and safe operation of the facility at which he is housed. In addition, Dr. Cheltenham concluded that Bedros did not require psychotropic medication in order to maintain his overall health. (Evaluation at 8.) Thus, Dr. Cheltenham opined that the court should proceed to consider the factors set forth in Sell for determining whether involuntary medication is warranted to restore trial competence. The court and both parties agree that involuntary medication cannot be justified on dangerousness or overall-health grounds in this case.

[3] Dr. Cheltenham did not testify to this factor because whether an important governmental interest is at stake is strictly a legal question. See United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004).

render the defendant competent to stand trial and is substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense; (3) involuntary medication is necessary to further those interests; and (4) that administration of the drugs is medically appropriate. Id. at 180-81.

According to Dr. Cheltenham, administering the psychotropic medication Haldol is an accepted and appropriate treatment for schizophrenia, disorganized type. (Tr. at 15.) Further, he opined that administering Haldol by injection once every four weeks over the course of four months would "likely" restore Bedros to competence. (Tr. at 14-15.) Dr. Cheltenham testified that some studies have found an eighty-seven percent general success rate in restoration of competence and other studies have found a seventy-seven percent success rate in treating patients with delusional disorder. He noted, however, that the literature did not address patients with disorganized type schizophrenia. (Id. at 15-16.) Based upon his review of comments provided by Dr. Hershberger, Dr. Cheltenham retracted his earlier estimate that Bedros had an eighty percent likelihood of restoration to competency and instead testified that his chances of restoration "would probably be around sixty percent."[4] (Id. at 23.) Upon cross-examination, Dr.

---

[4] In his review of Dr. Cheltenham's Evaluation, Dr. Hershberger noted certain factors in Bedros's case that might indicate a "poor clinical response" to antipsychotic treatment. (See May 18, 2008 Letter from Dr. Jason Hershberger to Anthony K. Modafferi (Def. Ex. 2).) In particular, Dr. Hershberger noted the length of Bedros's illness; the fact that much of the data on effective treatment of Schizophrenia involves treatment of Paranoid Type, rather than Disorganized Type, and that disorganized thought process is "notoriously treatment resistant"; Bedros's low IQ; and Bedros's lack of insight into his mental condition. As a result, Dr. Hershberger opined that Bedros has "a 25% chance of clinical improvement sufficient to restore him to legal competency." (Id.) Dr. Hershberger nevertheless supported the application for involuntary treatment given the "negligible" chance of restoration without antispsychotic treatment. (Id. at 3.)

The court has considered Dr. Hershberger's statement, which was admitted into evidence, but notes that defense counsel did not call Dr. Hershberger to testify to his opinion and its

Cheltenham testified that in cases like Mr. Bedros's it is difficult for psychiatrists to predict a percentage likelihood of competence restoration. In response to defense counsel's question whether "it's possible that the ability to actually affect Mr. Bedros competence could be much lower than 60 percent," Dr. Cheltenham responded that it was possible. (Id. at 33.) Dr. Cheltenham further acknowledged that a patient's response to antipsychotic mediaction is "highly idiosyncratic" and that Bedros's medical history did have factors which could mitigate against his restoration. Nonetheless, Dr. Cheltenham reiterated his estimation that Bedros was sixty percent likely to be restored to competence. (Id. at 37-38.)

In addition to his testimony regarding competence restoration, Dr. Cheltenham testified as to the possible side effects of antipsychotic medications and as to Bedros's additional health problems. With respect to side effects, Dr. Cheltenham testified that Haldol has "numerous side effects," most of which can be managed medically. (Id. at 16-17.) These include four different types of extrapyramidal side effects, which involve muscle spasms or restrictions in movement to varying degrees. Doctors monitor all patients for signs of such side effects and either administer additional medications that are effective in treating the side effects or adjust the antipsychotic medications to lessen the side effects. (Id. at 17-20.) Notwithstanding the possibility of side effects, Dr. Cheltenham opined that the proposed treatment is is not substantially likely to cause side effects that would interfere with Bedros's ability to assist his attorney and prepare a defense. (Id. at 21.) Dr. Cheltenham also stated that Bedros suffers from diabetes, hypertension,

---

variance with Dr. Cheltenham's opinion. As a result, the Government was not able to cross examine Dr. Hershberger, nor was the court able to inquire into his opinion. Thus, the court affords Dr. Cheltenham's expert opinion as to the likelihood of competency restoration, to which defense counsel did not object, greater weight than the percentage likelihood offered by Dr. Hershberger.

hyperlipidemia, and congestive heart failure. (Id. at 12, 25) Although, in Dr. Chelteham's opinion, the antipsychotic medications could cause an increase in Bedros's blood sugar, his cholesterol, and his weight, all of these could be dealt with through careful monitoring. (Id. at 34.) In addition, Dr. Cheltenham did not believe that antipsychotic medication would interfere or cause reactions with the medications Bedros is currently prescribed for his physical health problems or that they would worsen his other medical conditions. (Id. at 35.)

Finally, Dr. Cheltenham testified that no less-intrusive treatments, such as psychotherapy, would be effective in restoring Bedros to competence (id. at 16, 21) and that antipsychotic medications "are the only treatment left available for Mr. Bedros," (id. at 38.)

## III.   Discussion

The Government argued at the hearing without objection that (1) the Government has a substantial interest in timely prosecution of this case, which has been pending for two years and in which Defendant faces a zero to twenty year statutory term of imprisonment; (2) involuntary medication would further the Government's interest given the sixty percent likelihood that it would return Bedros to competence; (3) Dr. Cheltenham's testimony established that involuntary medication is necessary because Bedros had refused oral medication and denied he had a mental illness and because there is no other less intrusive means of restoring him to competence; and (4) Dr. Cheltenham's testimony established that the administration of Haldol is medically appropriate. (Id. at 39-42.)

Defense counsel pointed out Dr. Hershberger's significantly lower estimate of the likelihood that Bedros could be returned to competency, but also noted that Dr. Hershberger still believed that the Sell factors were satisfied in this case. (Id. at 44.) Defense counsel also

6

stressed that the treatment should be confined to a four-month period given Bedros's health problems and that the Government should get "one shot" to restore Bedros. (Id.) Ultimately, defense counsel stated that he did not object to granting the request for involuntary medication. (Id. at 48.)

The court agrees with both parties and concludes that there is clear and convincing evidence in this case to support the involuntary administration of antipsychotic medication to restore Bedros to competency. See United States v. Gomes, 387 F.3d 157, 160 (2d Cir. 2004) (noting that the Sell Court did not specify a standard of review and concluding that relevant findings must be supported by clear and convincing evidence). First, the Government's interest in bringing to trial an individual accused of the serious crime of reentering the United States after being convicted of an aggravated felony, as evidenced in part by the fact that Defendant faces a possible sentence of up to twenty years in prison, is important. In addition, none of the factors that may mitigate against the Government's need for prosecution, such as the possibility that an incompetent Defendant faces a lengthy commitment to a mental institution, appear in the record before the court. See id. at 160-61.

Second, the court finds that involuntary medication will significantly further the Government's interest. The Second Circuit has upheld a district court's finding that the second Sell factor was satisfied where the district court relied upon medical expert testimony of a "substantial probability" that the defendant would be restored to competence and upon the Bureau of Prison's seventy percent success rate in restoring defendants to competence through administration of antipsychotic medication. See id. at 161-62. Here, the court is mindful that Dr. Cheltenham revised his prediction down to sixty percent from eighty percent, that Dr.

Hershberger expressed concern that the prognosis for competence restoration may be even lower in Bedros's case, and that Bedros's history and diagnosis present particular problems for effective treatment and for accurately predicting the likelihood of competence restoration. Nonetheless, the court places significant weight on Dr. Cheltenham's testimony under oath that, even in light of Dr. Hershberger's concerns and Bedros's specific circumstances, he maintains the view that competence restoration for Bedros is sixty percent likely, though he acknowledges that it could be less. Based upon this testimony, the court finds that treatment is substantially likely to restore Bedros to competence. Further, the court finds that the potential side effects of medication are substantially unlikely to inhibit Bedros from assisting in his own defense, given the likelihood that Bedros will be carefully monitored for side effects, any side effects could be effectively treated, and any side effects are unlikely to interfere with Bedros's other medical problems.

Third, Dr. Cheltenham testified unequivocally that the administration of antipsychotic medication presents the only possibility for restoring Bedros to competence and that any alternative, less intrusive means of therapy would be ineffective given Bedros's lengthy history of mental illness and his unwillingness to admit that he even has a mental illness. Significantly, Dr. Cheltenham testified that Bedros would be offered the choice to consent to taking his medication voluntarily and provided with oral medication if he so chose. Accordingly, I find that forced medication is necessary to restore Bedros to competence. See id. at 162-63 (holding that forced medication was necessary where medical experts testified that alternative forms of treatment would be ineffective, primarily because "one of the delusions [the defendant] entertains is that he is sound"; noting that medical experts testified that the defendant would first be asked

8

to take medication voluntarily before it would be administered by force).

Fourth, and finally, Dr. Cheltenham testified that administering Haldol is a medically appropriate treatment for Bedros's symptoms. Dr. Cheltenham also testified to significant monitoring procedures to insure a medically appropriate response to any side effects that may develop. Based upon this testimony, I conclude that the proposed treatment is medically appropriate in this case. See id. at 163.

## III. Conclusion

For the foregoing reasons, the Government's application for involuntary medication of Defendant is granted based upon the court's finding that each of the Sell factors has been satisfied. The program of treatment shall be conducted for a period of four months and in accordance with the details set forth in the Evaluation and to which Dr. Cheltenham testified. At the conclusion of treatment, the parties shall apprise the court of their opinions as to whether Defendant has been restored to competence sufficient to proceed to trial.


SO ORDERED.

                                                                         s/Nicholas G. Garaufis
Dated: June 13, 2008                NICHOLAS G. GARAUFIS
      Brooklyn, N.Y.             United States District Judge